IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| KENSINGTON RESEARCH AND RECOVERY, | ) ) ) ) |
| Plaintiff, | ) Case No. 10 C 3538 |
| v. | ) ) Judge Virginia M. Kendall |
| UNITED STATES DEPARTMENT OF TREASURY, BUREAU OF PUBLIC DEBT, | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kensington Research and Recovery ("Kensington") filed suit against the U.S. Department of Treasury ("Treasury Department") and Bureau of Public Debt ("BPD") (collectively "Defendants") seeking injunctive relief under the Freedom of Information Act ("FOIA") after the BPD denied its request for records regarding matured, unredeemed savings bonds. Defendants move for summary judgment because the BPD does not maintain the information in the form Kensington requested and, in the alternative, that a privacy exemption to FOIA applies. For the following reasons, the Court grants Defendants' Motion for Summary Judgment.

**STATEMENT OF UNDISPUTED FACTS**[1]

**I.  Parties**

The BPD is an arm of the U.S. Treasury Department that oversees the U.S. Savings Bond program. (Ken. 56.1 Resp. ¶ 1.) The BPD maintains registration records for savings bonds,

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Plaintiffs' Response to Defendants' Statements of Material Fact have been abbreviated to "Ken. 56.1 Resp. ¶ __."; and citations to Defendants' Response to Plaintiffs' Statement of Additional Facts have been abbreviated to "BPD Resp. Ken. Add. Facts ¶ __."

including matured savings bonds that have not been redeemed by their owners, which are known as "Matured Unredeemed Debt" or "MUD." (*Id.* ¶¶ 2, 3.) Kensington is an Illinois corporation "focused upon returning government-held monies to their rightful individual and corporate owners." (*Id.* ¶ 14; Compl. ¶ 2.) Kensington earns a profit from aiding individuals recover their unclaimed assets for a fee.

## II. Organization of Registration Records

The BPD maintains MUD registration records which contain the name of the registered owner, and any beneficiaries, as well as the owner's address and social security number, bond issue date, and bond serial number.[2] (Ken. 56.1 Resp. ¶ 4.) These registration records, which identify the owner of a particular savings bond, are contained on microfilm. (*Id.* ¶¶ 5, 7.)

The BPD uses two electronic indices to help locate particular records on the microfilm. (*Id.* ¶ 8.) For locating accrual savings bonds, the BPD uses SaBRe; for current income savings bonds, the BPD uses the HH/H system. (*Id.* ¶ 8.) These indices identify the "batch" of microfilm that contains the bond's registration number. (*Id.* ¶¶ 9, 13.)

To search the electronic indices, the BPD must receive certain background information from the individual with an interest in the bond, such as the individual's social security number or address, or the bond's serial number. (*Id.* ¶ 10.) Using this predicate information, the BPD searches in the indices to find the location of the microfilm for the requested record. (*Id.* ¶ 11.) After reviewing the microfilm, the BPD is able to confirm ownership of the bond. (*Id.*)

---

[2] Kensington "neither admits nor denies" this fact, in addition to facts 5-14, 23-24, 27-29, and 32. Under Local Rule 56.1, the Court deems these facts admitted. *See, e.g., Carter v. Pension Plan of A. Finkl 7 Sons Co. for Eligible Office Employees*, No. 08 C 7169, 2010 WL 1930133, at *15 n.14 (N.D. Ill. May 12, 2010) (Pallmeyer, J.)

In lieu of submitting this information to the BPD to perform the search, individual bondholders can also use the BPD's website, Treasury Hunt®, to see if they own any matured, unredeemed savings bonds. (*Id.* ¶ 12.) By simply entering their social security number into a field on the website they can determine if they own any bonds. (*Id.*)

### III. Kensington's FOIA Requests

Kensington requested information from the BPD on two separate occasions: (1) August 2009, and (2) October 2009, which is the request at issue in this case.

#### A. August 21, 2009 Request

On August 21, 2009, Kensington asked the BPD whether it could "make a list available of the purchasers of unclaimed treasury securities pursuant to a FOIA request or otherwise?" (*Id.* ¶ 15.) On August 24, 2009, the BPD responded that it does not maintain such a comprehensive list, and even if it did, it would not share it with Kensington due to privacy and confidentiality issues. (*Id.* ¶ 16.) The BPD, however, ended up providing Kensington with some information on the matured, unredeemed debt of "non-individuals" on September 4, 2009. (*Id.* ¶ 18.)

#### B. October 30, 2009 Request

Kensington requested additional records on October 30, 2009. (Ken. 56.1 Resp. ¶ 21.) In this request Kensington sought information with respect to "Matured Unredeemed Debt (MUD) of security records for individual holders of securities which matured during the calendar year of 2007." (*Id.*) In submitting the FOIA request, Kensington conceded that privacy laws prevented the BPD from disclosing certain personal information of the bondholders, such as their social security numbers and birth dates. (*Id.* ¶ 22; BPD Resp. Ken. Add. Facts ¶ 4.) As a result, Kensington asked the BPD to redact this information from the records. (Ken. 56.1 Resp. ¶ 22.)

3

The BPD interpreted Kensington's request to broadly seek all records of unredeemed bonds that matured in 2007. (*Id.* ¶¶ 23, 24.) Based on the BPD's electronic search capabilities, however, it could not perform searches to gather all the savings bonds issued in a particular year, nor could it segregate bonds according to the year of maturation.[3] (*Id.* ¶ 25.)

The BPD was therefore ill-equipped to fully comply with Kensington's request. In fact, to satisfy Kensington's request, the BPD would have had to create a new search tool to apply to both the SaBRe and HH/H system indices. (*Id.* ¶¶ 26, 32.) Using the information from this search, the BPD would have had to create a results report to aid in locating each bond on a specific reel of microfilm. (*Id.* ¶ 27.) The BPD has about 1.3 million reels of microfilm, and each reel contains about 9,000 images. (*Id.*) The researcher would then have to search the microfilm reel and recover the registration record for the bond. (*Id.* ¶ 28.)

After this manual search for each bond listed on the results report, the BPD would have had to aggregate all of the relevant information to turn over to Kensington. (*Id.* ¶¶ 29, 30.) Compiling this information would be costly in time and money. Michael McDougle, Acting Director of the Division of Records Systems for the BPD, estimates that compliance with Kensington's request for unredeemed bonds that matured in 2007 would cost millions of dollars. (*Id.* ¶ 31; McDougle Aff. ¶ 44.)

On November 4, 2009, the BPD "denied in full" Kenginston's request. (Ken. 56.1 Resp. ¶¶ 33, 35, 55.) The BPD noted that it did not have any "responsive records" for Kensington, and even

---

[3] Kensington objects to this statement as conclusory, but does not cite any contrary facts. First, the statement is not conclusory; rather, it is based on the detailed affidavit of Michael J. McDougle about the BPD's search ability. Second, Kensington's response does not point to any facts controverting this fact, so it is deemed admitted.

if it had the records, it would not release them because FOIA Exemption 6 allows denial of requests that constitute a "clearly unwarranted invasion of personal privacy." (*Id.* ¶¶ 33, 34.)

IV.     **FOIA Appeal**

Kensington filed an appeal on December 11, 2009, within 35 days of the BPD denying its FOIA request. (*Id.* ¶ 36.) The Assistant Commissioner of the BPD responded to Kensington's appeal in a January 13, 2010 letter, stating that Exemption 6 applied and therefore the BPD stood behind its previous denial of the FOIA request. (*Id.* ¶¶ 37-39.) The letter articulated that individuals have a significant privacy interest in their names and addresses, especially when linked with financial information. (*Id.* ¶ 40.) Moreover, the letter explained that this expectation of privacy is even higher where the government "pledges confidentiality." (*Id.* ¶ 41.) The BPD made such a pledge to bondholders in its regulation controlling "confidentiality of records relating to individuals purchasing securities." (Pl. 56.1 Resp. ¶¶ 41, 42.) The relevant regulation states:

> *Records relating to the purchase, ownership of, and transactions in Treasury securities or other securities handled by the Bureau of Public Debt . . . will ordinarily be disclosed only to the owners of such securities*, their executors, or other legal representatives or to their survivors or to investigative and certain other agencies of the Federal and State governments, to trustees in bankruptcy, receivers of insolvents' estates or where a proper order has been entered requesting disclosure of information to Federal or State courts. *These records are confidential because they relate to private financial affairs of the owners under this Part. In addition, the information falls within the category of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" under the Freedom of Information Act.*

(*Id.* ¶ 43; 31 C.F.R. 323.2) (emphasis added).

In addressing Kensington's appeal, the BPD thoroughly examined the application of Exemption 6. (Ken. 56.1 Resp. ¶ 47.) In balancing the privacy interests in nondisclosure and the public interests in disclosure, the BPD letter stated that releasing records of the individual

5

bondholders would not provide a more transparent understanding of the BPD's operations, which is the main purpose of FOIA. (*Id.* ¶¶ 44-46, 49.) In addition, the BPD guarantees to purchasers of government bonds that the records are confidential, so revealing the bondholders' personal information to Kensington could discourage others from buying bonds. (*Id.* ¶ 54.) Finally, every month the BPD publicizes the total amount of matured, unredeemed savings bonds and individual bondholders have the ability to use the Treasury Hunt® website to obtain this information on their own. (*Id.* ¶¶ 50, 51.)

On June 9, 2010, Kensington filed this suit, seeking release of the 2007 MUD records. (*Id.* ¶ 56.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

Because disclosure is the "dominant objective" of the FOIA, the Court narrowly construes FOIA exemptions. *Patterson v. I.R.S.*, 56 F.3d 832, 835 (7th Cir. 1995); *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 181 (1993). As such, the government agency has the burden to support its

decision to deny the FOIA request. *Patterson*, 56 F.3d at 837. The Court may grant summary judgment in favor of the agency in a FOIA case "only if 'the agency affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed.'" *Id.* (quoting *PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 250 (D.C. Cir. 1993)). Summary judgment in a FOIA case is different from other civil cases because it does not turn only on the existence of genuine issues of material fact; instead, the inquiry is also whether the agency "fully discharged its obligations under the Act." *See, e.g., Fazzini v. Dep't of Justice*, No. 90 C 74649, 1991 WL 74649, at *3 (N.D. Ill. May 2, 1991) (Conlon, J.).

## DISCUSSION

The BPD moves for summary judgment for two independent reasons. First, it contends that it does not regularly maintain the information in the form that Kensington requested and it has no duty to compile information to satisfy a FOIA request. Second, the BPD claims that FOIA Exemption 6 applies, which allows withholding information that constitutes an unreasonable invasion into the bondholder's right to privacy.

**I.      Maintaining Records in Form Requested**

In applying FOIA, district courts have jurisdiction to compel a government agency to disclose certain records if the plaintiff can establish that the agency (1) improperly; (2) withheld; (3) agency records. *See* 5 U.S.C. § 552(a)(4)(B); *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980). The BPD argues that under the "agency records" element, it has no obligation to comply with Kensington's request because FOIA only requires turning over already-existing

7

documents in the government agency's possession. It does not require the agency to create new documents to satisfy a FOIA request.

"Agency records" are those materials within control of the agency when it received the FOIA request. *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 145 (1989). Possession or control by the agency is required for the FOIA obligations to apply: "The Act does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained." *Kissinger*, 445 U.S. at 152. It is the Federal Records Act, not FOIA, that requires the government agency to create records in response to information requests. *Id.*; *Fazzini*, 1991 WL 74649, at *3 (FOIA is not a "private discovery tool," so government agencies are not required to "create records that do not exist").

Even if an agency has data or statistics within its control, it need not compile or aggregate that information into a new form for the sole purpose of satisfying a FOIA request. *Borom v. Crawford*, 651 F.2d 500, 502 (7th Cir. 1981) ("general request for data, information and statistics to be gleaned from documents which have not been created and which the agency does not generally create or require" is impermissible); *see, e.g., Krohn v. Dep't of Justice*, 628 F.2d 195, 198 (D.C. Cir. 1980) (request for "selective information," not designated records, was also invalid). For example, in *Borom* the requester asked the Parole Commission for specific information regarding parole or early release of black and white federal prisoners. *See* 651 F.2d at 500. Because this was a "general request" that required the Parole Commission to review all of its criminal records to compile the relevant statistics, the government agency was entitled to summary judgment in its favor. *Id.* at 502.

Here, the BPD does not maintain records that compile by year the matured, unredeemed bonds, with accompanying personal information about the bondholder. In other words, when the

8

BPD received Kensington's FOIA request, it did not have in its possession "records" of the kind Kensington sought. The BPD accommodates individual searches to determine bond ownership in two ways: the requester can use Treasury Hunt® or submit predicate information to the BPD researcher, who examines the microfilm and notifies the individual of the results. (Ken. 56.1 Resp. ¶¶ 11, 12.) In the normal course of carrying out its duties, however, the BPD did not organize in a cumulative fashion the information in Kensington's request. In a situation like this, *Kissinger* and *Tax Analysts* protect the BPD from having to create entirely new documents for the purpose of satisfying a FOIA request.

The fact that the BPD had this information in its databases for individual bondholders, just not in the precise form that Kensington wanted, does not make the request any more valid under FOIA. The BPD would have to create a new search tool, use the results of that to manually find the relevant registration records, and consolidate that information into a chart or other document for Kensington. (*Id.* ¶¶ 27-31.) FOIA imposes no such duty on the BPD. *See Borom*, 651 F.2d at 502.

Similarly, Kensington maintains that factual issues prevent the Court from granting summary judgment. First, it claims that the BPD's method for managing the savings bond information is outdated and fails to comply with Treasury Department Regulations, which require savings bond information to be organized in a "retrievable" manner. (R. 19, Ken. Resp. Br. at 8.) Second, Kensington argues that discovery is necessary "to assess the availability, accessibility, and condition" of the information in the BPD's possession when Kensington served its request. (*Id.*)

The BPD's method for organizing its records is consistent with its obligation under the Privacy Act of 1974. For savings bonds, the Federal Register states that "[i]nformation can be retrieved alphabetically by name, address, and period of time the security was issued, by bond serial

9

numbers, other assigned identifier, or, in some cases, numerically by social security number." Privacy Act of 1974; Systems of Records, 73 Fed. Reg. 42,904, 42,908 (July 23, 2008). McDougle's affidavit explains the BPD's current system for retrieving information for an individual bondholder: the BPD uses certain predicate information, such as a social security number, address, or bond serial number to locate the microfilm containing the record. (Ken. 56.1 Resp. ¶¶ 10-11.) This method directly matches the Privacy Act's requirements and Kensington fails to present with any specificity how the BPD's system is otherwise inadequate.

Moreover, Kensington attempts to avoid summary judgment by generally asserting that discovery is necessary to determine the "availability, accessibility, and condition" of the data within the BPD's control. (R. 17, Ken. Resp. Br. at 9.) Kensington's General Counsel, Douglas W. Fournier, states that after entering his social security number into the Treasury Hunt® website he immediately received a response that there were no matching bond records. (Fournier Aff. ¶ 8.) As such, Kensington seeks discovery about why the Treasury Hunt® website can provide an immediate response to an individual inquiry yet the BPD cannot provide the compiled data for Kensington's request.

At the summary judgment stage, the Court can rely on agency affidavits submitted in good faith to determine FOIA violations. *See Becker v. I.R.S.*, 34 F.3d 398, 406 (7th Cir. 1994); *In re Matter of Wade*, 969 F.2d 241, 249 n.11 (7th Cir. 1992) ("In the face of government affidavits made in good faith, speculation [about unreasonableness of the search does] not defeat the summary judgment motion on this issue."). Kensington's request for further discovery is purely speculative and fails to point out any deficiencies in McDougle's affidavit. For example, Kensington generally states, without elaboration, that this affidavit leaves "much to the imagination." (R. 17, Ken. Resp.

Br. at 9.)  The undisputed facts, as partially drawn from McDougle's affidavit, are detailed enough to enable the Court to find that the BPD does not normally maintain records in the form that Kensington requested.  Because the BPD had no duty to compile its information to satisfy FOIA requests, discovery would be futile.

Because the BPD's "agency records" are not in a form that is responsive to Kensington's FOIA request, this Court grants the BPD's Motion for Summary Judgment.

## II.     FOIA Exemption 6

In the alternative, the BPD asserts that FOIA Exemption 6 applies, which prevents the BPD from having to disclose "personnel and medical files and *similar files* the disclosure of which would constitute a *clearly unwarranted invasion of personal privacy*."  *See* 5 U.S.C. § 552(b)(6) (emphasis added).  The policy goal behind FOIA is the "broad disclosure" of documents that illuminate for the public the workings of government.  *Lakin Law Firm, P.C. v. F.T.C.*, 352 F.3d 1122, 1123 (7th Cir. 2003).  FOIA does not, however, compel disclosure of "information about private citizens that happens to be in the warehouse of the Government."  *Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 775 (1989).  Despite FOIA's liberal disclosure policy, statutory exemptions such as Exemption 6 allow government agencies to reject information requests.

Kensington challenges Exemption 6 for two reasons: (1) the information requested is not a "similar file," and (2) the public interest in releasing the information outweighs any countervailing privacy interest in nondisclosure.

### A.     "Similar File"

Where, as here, the records at issue are not medical or personnel documents, the Court must decide if Kensington's request involves disclosure of "similar files."  The term "similar files" is

broadly interpreted and is not limited to files that contain "only a discrete kind of personal information." *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982). Instead, Exemption 6 applies to disclosure of "Government records on an individual which can be identified as applying to that individual." *Id.*

Kensington contends that by requesting that the BPD redact certain personal information such as social security numbers and birth dates, this released information would not be linked to the individual bondholders. (Pl. 56.1 Resp. ¶ 22; Def. Resp. Pl. Add. Facts ¶ 4.) Kensington's specific request, however, was for "records of individual holders of securities which matured during the calendar year of 2007. (Compl. ¶ 19.) Kensington seeks records associated with individual bondholders as opposed to general information about savings bonds. Along similar lines, Kensington wants to use the requested information, in part, to contact individual bondholders and offer to help them redeem their bonds. In its Complaint, Kensington describes itself as a "commercial entity focused upon returning government-held monies to their rightful individual and corporate owners." (Compl. ¶ 2.) Because the FOIA request encompasses information leading to the identification of individual bondholders, it constitutes a "similar file" under Exemption 6.

### B. Public v. Privacy Interests

The government agency that denied the FOIA request has the initial burden to provide a "detailed analysis" of the reasons why the exemption applies. *Antonelli v. F.B.I.*, 721 F.2d 615, 617 (7th Cir. 1983) (quoting *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)). After the agency meets this initial burden, the Court weighs to agency's reason for nondisclosure against the public interest supporting disclosure to decide whether disclosure is "clearly unwarranted." *Id.* at 617; *U.S. Dep't of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 495 (1994).

The information request at issue seeks records of individual holders of savings bonds that matured during the 2007 calendar year. (Ken. 56.1 Resp. ¶ 21.) Kensington requested this information "in support of its mission" of "returning government-held monies to their rightful individual and corporate owners" and informing clients about unredeemed savings bonds (Compl. ¶¶ 2, 6.) Kensington conceded in its request that privacy laws prevented the release of "certain personal information such as social security numbers, birth dates, etc." so it asked the BPD to redact this information. (Ken. 56.1 Resp. ¶ 22.) As written, this redaction proposal does not specifically cover all of the identifying information on the MUD registration records, such as the name and address of the bond owner, the bond issue date, and the bond serial number. (*Id.* ¶ 4.) The BPD contends that the redaction proposal was incomplete because it failed to include all information that could potentially associate a particular bondholder with his or her ownership of unredeemed bonds. Even assuming the redaction proposal gave the BPD discretion to redact any "private information," the very nature of the registration records is to document ownership of savings bonds. Because the BPD refused to turn over the records in their entirety rather than in redacted form, the Court will evaluate the propriety of the BPD's nondisclosure in that context.

Turning to the privacy interests supporting nondisclosure, the release of identifying information, such as a name or address, by itself, does not conclusively establish a privacy interest. *Dep't of the Navy v. Fed. Labor Relations Auth.*, 975 F.2d 348, 352 (7th Cir. 1992) (quoting *Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 968 F.2d 503, 511 (2d Cir. 1992)). Rather, the Court must look to the "defining characteristic" associated with the release of identifying information. *Id.* at 353. Here, the defining characteristic is the financial information of a specific bondholder, specifically, the extent to which he or she owns matured, unredeemed savings bonds.

13

"Privacy" in this context refers to the "individual interest in avoiding disclosure of personal matters." *Reporters Committee*, 489 U.S. at 762. Disclosure of government records that link certain financial information to a specific individual implicate privacy interests. *See, e.g., Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 876-79 (D.C. Cir. 1989) (privacy interest in disclosure of name, address, and status as annuitant because, as a consequence of disclosure, the individuals would receive unwanted solicitations because disclosure had "apparent commercial value"); *Aronson v. U.S. Dep't of Housing and Urban Dev.*, 822 F.2d 182, 186 (1st Cir. 1987) (identifying information coupled with financial information is significant privacy interest because "[w]hen it becomes a matter of public knowledge that someone is owed a substantial sum of money, that individual may become a target for those who would like to secure a share of that sum by means scrupulous or otherwise").

Disclosure of individual bondholders' registration records for savings bonds that matured in 2007 connects the identity of the bondholders to ownership of matured, unredeemed savings bonds. The disclosure of specific information on the registration records, such as the name, address, or bond serial number would publicize the financial affairs of the individual bondholders. Even more generally, revealing ownership records of individual bondholders entails an invasion of privacy. Disclosure, like in *Horner* and *Aronson*, would also expose the bondholders to unsolicited attempts by Kensington and other companies to collect the unredeemed bonds. Kensington's Complaint, along with its request for the "individual records" of bondholders, demonstrate an intent to solicit the bondholders as "future clients" to recover the "monies rightfully owed to them." (Compl. ¶ 6.)

Similarly, in Kensington's August 21, 2009 FOIA request, it broadly requested a list of the "purchasers of unclaimed treasury securities," and the BPD only disclosed information in its possession for non-individuals, which have no privacy rights. (Ken. 56.1 Resp. ¶ 15.) The later October 30, 2009 FOIA request, which is at issue here, appears to be a modification of the August 2009 request, and sought not a list of the purchasers of unclaimed savings bonds, but the registration records for each of the individual bondholders. (*Id.* ¶ 21.) Such an individualized request shows that there is a tangible threat that disclosure of the requested information could be used to "interfere[] with the personal privacy" of the bondholders, who have a privacy interest in keeping confidential the fact that they possess savings bonds. *See, e.g., Horner*, 879 F.2d at 878; *Dep't of Air Force v. Rose*, 425 U.S. 352, 380-81 n. 19 ("The legislative history is clear that Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities.").

Moreover, the BPD pledged confidentiality and protection under Exemption 6 to current and potential bondholders. (Ken. 56.1 Resp. ¶¶ 41, 42.) The regulation states, in part:

> Records relating to the purchase, ownership of, and transactions in Treasury securities or other securities handled by the Bureau of Public Debt . . . are confidential because they relate to private financial affairs of the owners under this Part. In addition, the information falls within the category of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" under the Freedom of Information Act.

(*Id.* ¶ 43; 31 C.F.R. 323.2.) The BPD's promise of confidentiality raises the bondholders' expectation of privacy, and enhances the privacy interests of nondisclosure. *See, e.g., Washington Post Co. v. U.S. Dep't of Health and Human Serv.*, 690 F.2d 252, 263 (D.C. Cir. 1982) (pledge of confidentiality "given weight on the privacy side of the scale" unless the public interest in disclosure is high and the privacy interest is otherwise insignificant).

Because of this significant privacy interest, the Court must evaluate the offsetting public interest supporting disclosure of the registration records. It in not incumbent on the Court to make policy judgments as to which FOIA requests are in the "public interest." After all, FOIA applies to "any person" and as such "[e]ither all requestors have access, or none do." *Dep't of the Navy*, 975 F.2d at 355. FOIA intends to expose to public scrutiny what the "government is up to," so a disclosure that uncovers nothing about the activities of a particular agency has no recognizable public interest. *Id.* at 353-54. That is, the only aspect of the public interest inquiry is whether the FOIA request seeks information about the agency's operations or activities that shed light on fulfillment of its statutory responsibilities. *Id.* at 354; *Reporters Committee*, 489 U.S. at 774.[4]

Here, Kensington maintains that disclosure of the requested registration records would serve the public interest by exposing the BPD's outdated record-keeping system and the distribution of the unclaimed monies would lower the national debt. First, as discussed, the BPD's method of organizing bondholder information complies with the record-keeping requirements of the Privacy Act of 1974. Along similar lines, the release of the requested registration records for individual bondholders reveals the private financial information contained on the records, not anything about the BPD's activities. Second, Kensington's admitted use of this information—to contact bondholders to help them redeem their savings bonds—would lower the national debt, but again, this sheds no light on the BPD's performance of its statutory duties. Therefore, neither of these reasons is a valid public interest. *See, e.g., Horner*, 879 F.2d at 879 (releasing names and addresses of federal annuitants would uncover nothing about the activities of the government); *Federal Labor*

---

[4] Even though *Reporters Committee* involved Exemption 7, not Exemption 6, its definition of public interest in evaluating FOIA disclosures under Exemption 6 is equally applicable. *See Dep't of Navy*, 975 F.2d at 353 n. 2.

*Relations Auth.*, 510 U.S. at 495 (disclosure of addresses of bargaining unit employees revealed nothing about the employing agency's operations). Simply put, the release of the registration records of individual bondholders would not elucidate what the BPD "is up to"; instead, the records would impermissibly expose private citizens' financial information.[5] As a result, Kensington has failed to carry its burden and the Court finds that there is no recognizable public interest supporting disclosure.[6]

Given the significant private interests in nondisclosure, and the lack of public interests supporting disclosure, release of the registration records would constitute a clearly unwarranted invasion of personal privacy. *See Matter of Wade*, 969 at 247 (7th Cir. 1992) ("A modest disclosure would be 'clearly unwarranted' if no reason exists warranting its dissemination."). Exemption 6 therefore applies, justifying the BPD's denial of Kensington's FOIA request.

## CONCLUSION AND ORDER

For these reasons, the Court grants the Defendants' Motion for Summary Judgment.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: June 30, 2011

---

[5] In addition, release of the registration records would not provide new insight for the public with respect to the total amount of matured, unredeemed bonds because the BPD publicizes this amount every month. (Ken. 56.1 Resp. ¶ 50.) Through a website called Treasury Hunt® the BPD also allows individual bondholders to search on their own to see if they own any matured, unredeemed savings bonds. (*Id.* ¶ 51.)

[6] The BPD argued that the unredeemed bonds are not unclaimed property and exist in perpetuity, and as such Kensington would serve no public interest. This is not directly relevant to this analysis. In any event, upon presentment of savings bonds, regardless of the time that has elapsed, the government will pay the bondholder. *See* 31 C.F.R. § 353.37; 31 C.F.R. § 353.39(a).